ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

OCT - 4 2010

JAMES N. HATTEN, Clerk
By: 
       Deputy Clerk

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

JACK T. CAMP, JR.

**CRIMINAL COMPLAINT**

CASE NUMBER 1:10-MJ-1415

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

> From in or around Spring 2010 through on or about October 1, 2010, in the Northern District of Georgia, defendant JACK T. CAMP, JR., an unlawful user of controlled substances, did knowingly possess in and affecting commerce, firearms in violation of Title 18, United States Code, Section 922(g)(3);

> did knowingly, intentionally and without authority possess controlled substances, to wit, cocaine hydrochloride, a Schedule II controlled substance, marijuana, a schedule I controlled substance and roxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 844(a);

> did knowingly, intentionally and without authority, attempt to possess controlled substances, to wit, cocaine hydrochloride, a Schedule II controlled substance and roxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 844(a);

> did aid and abet the possession of controlled substances, to wit, cocaine hydrochloride, a Schedule II controlled substance, marijuana, a schedule I controlled substance and roxycodone, a Schedule II controlled substance, by a previously convicted drug felon, in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Section 844(a);

> and did attempt to aid and abet the possession of controlled substances cocaine hydrochloride, a Schedule II controlled substance and roxycodone, a Schedule II controlled substance by a previously convicted drug felon in violation of Title 21, United States Code, Sections 846 and 844(a) and Title 18, United States Code, Section 2.

I further state that I am a Special Agent with the Federal Bureau of Investigation (FBI) and that this complaint is based on the following facts:

*see attached affidavit*

Continued on the attached sheet and made a part hereof.          (X) Yes     ( ) No

*Mary J. Mangrum*
Signature of Complainant

Mary Jo Mangrum, Special Agent
Name and Title of Complainant

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.
Sworn to before me, and subscribed in my presence.

Charles S. Coody
Name of Issuing Officer

Signature of Issuing Officer

United States Magistrate Judge
Title of Issuing Officer

October 4, 2010 in Atlanta, GA
Date and Location

## AFFIDAVIT FOR COMPLAINT 1:10-MJ-1415

I, Mary Jo Mangrum, being duly sworn, hereby state that I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such. The source of my information and the grounds for my belief are as follows:[1]

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 21 years and have been assigned to a squad tasked with investigating public corruption for approximately 6 years. During my tenure with the FBI, I have participated in numerous long-term investigations, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed and analyzed recorded conversations, and debriefed cooperating witnesses and confidential informants.

2. Where actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. I am familiar with the facts and circumstances of this matter from: (a) my personal participation in this investigation and in other investigations involving public corruption, firearms, and controlled substances; (b) reports made to me by other special agents of the FBI; (c) information obtained from confidential informants; and (d) consensual recordings.[2]

---

[1] Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

[2] Not all relevant recordings are described herein. Moreover, for those recordings described, not all relevant portions of such conversations have been described. To the extent that quotations are used in the descriptions below, the quoted segments are based on reviews of recordings and not final transcripts.

1

## THE INVESTIGATION

4. In or about the Spring of 2010, the defendant, JACK T. CAMP, JR., met CI-1[3/] at the Goldrush Showbar in Atlanta, Georgia, where CI-1 worked as an exotic dancer. As part of CI-1's work, CI-1 offered private dances in exchange for money in the VIP area of the club. CAMP purchased a private dance from CI-1.

5. The defendant, JACK T. CAMP, JR., returned to the Goldrush Showbar the following day and again purchased a private dance from CI-1. CAMP also paid CI-1 in exchange for sex. CAMP asked CI-1 what CI-1 was "on," which CI-1 understood to mean what drugs CI-1 had taken. CI-1 has used a variety of controlled substances including cocaine, marihuana, Roxycodone, and Hydrocodone, and is familiar with how these substances look, smell, and taste, as well as their physical effects. CI-1 told CAMP that CI-1 had used cocaine and CAMP asked CI-1 if CI-1 had any more that CAMP could ingest. CI-1 did have additional cocaine and, in fact, provided CAMP with a quantity of cocaine. CAMP paid CI-1 approximately $40 - $50 in cash

---

[3/] CI-1 is an individual who recently began cooperating with the FBI. At the direction of the FBI, CI-1 has conducted consensually recorded conversations with CAMP. The information provided by CI-1 regarding CAMP'S activities has been corroborated in numerous ways, some of which are described herein, such as consensual recordings made by CI-1. CI-1 has a federal felony conviction for use of a telephone in connection with a drug trafficking crime. CI-1 has admitted engaging in criminal activity including in 2010 engaging in prostitution and purchasing and using controlled substances. Further, prior to CI-1's cooperation with the FBI, CI-1 surreptitiously recorded CAMP. The recordings described herein include recordings made by CI-1 prior to CI-1's cooperation as well as recordings made at the direction of the FBI. In addition, prior to CI-1's contact with the FBI, CI-1 had contact with the Drug Enforcement Administration ("DEA") and the Georgia Bureau of Investigation ("GBI"). At the direction of an individual associated with CI-1, ("Person A"), CI-1 falsely informed the DEA and GBI that CI-1 had more recordings of CAMP than CI-1, in fact, had. Additionally, CI-1 has been promised that CI-1 will not be prosecuted for the criminal activity that CI-1 has admitted to the government.

for the cocaine. CAMP ingested the cocaine in the presence of CI-1 by snorting the cocaine through his nose. CI-1 also ingested a quantity of cocaine by snorting it through CI-1's nose.

6. On multiple subsequent occasions in or about and between the Spring and Summer 2010, the defendant, JACK T. CAMP, JR., paid CI-1 in exchange for sex. When CAMP and CI-1 would meet, they would often use drugs together including cocaine, Roxycodone, also known as "Roxicet," "Roxi" and "Roxycontin," a Schedule II controlled substance, and marihuana, a Schedule I controlled substance. CAMP would provide money to CI-1 for CI-1 to purchase the cocaine, Roxycodone and marihuana. Generally, CI-1 and CAMP would use the drugs that CI-1 purchased with CAMP's money when they were together, though sometimes CI-1 would simply buy the drugs and give them to CAMP for his own use. When CAMP and CI-1 would use drugs together, they would ingest both the cocaine and the Roxycodone by snorting it through their noses and they would ingest the marihuana by smoking it. In order to snort the Roxycodone, CAMP and CI-1 would use a pill crusher to create a powdered form of the Roxycodone. In fact, CAMP gave CI-1 a pill crusher for CI-1's use.

7. In or about June 2010, the defendant, JACK T. CAMP, JR., and CI-1 agreed that CI-1 would go to a particular location to purchase Roxycodone for them both. CAMP gave cash to CI-1 for the purpose of CI-1 buying the Roxycodone pills. CI-1 drove to a residence in Marietta, Georgia, to purchase the Roxycodone. Unbeknownst to CI-1 at the time, CAMP followed CI-1 to the drug transaction. After the drug transaction, CI-1 met CAMP in order to give CAMP Roxycodone for his personal use. When CI-1 went to the vehicle that CAMP was driving, CI-1 observed a small, black metal, semiautomatic handgun on the front seat of the vehicle. CAMP told CI-1 that he had followed CI-1 to the drug transaction and that he had the

3

gun out to protect CI-1. CI-1 gave CAMP a quantity of Roxycodone and then CAMP and CI-1 parted ways.

8.  In or about September 2010, the defendant, JACK T. CAMP, JR., and CI-1 met at Follies, in Atlanta, Georgia, where CI-1 occasionally worked as an exotic dancer. While at Follies, CAMP and CI-1 each snorted cocaine that CI-1 obtained from "Person A." After leaving the club, CAMP and CI-1 got into a vehicle with CAMP in the driver's seat and CI-1 in the front passenger's seat. CAMP made statements to indicate that he was unhappy about the way Person A was treating CI-1. CAMP had a firearm on his lap when he was expressing his displeasure about the situation. At one point, CAMP opened his car door as if to get out of the vehicle, at which point, CI-1 became concerned that CAMP was going to confront Person A and asked CAMP not to get out of the car.

9.  On or about September 28, 2010, in a recorded telephone conversation, the defendant, JACK T. CAMP, JR., and CI-1 discussed getting together over the coming weekend. Specifically, CAMP and CI-1 discussed getting drugs that they could use together including cocaine and Roxycodone. CAMP indicated that he did, in fact, "want to get some." In deciding the type and quantity of drugs to purchase, CAMP stated "I think I'd rather have the, what are they, Roxis, uh, but I don't mind sending a little extra if you want to get a little of the other too." When asked if "the other" meant cocaine, CAMP said yes. CI-1 asked if CAMP was going to use the cocaine with CI-1 and CAMP said that he would. As for the Roxycodone, CAMP ultimately decided that CI-1 should purchase 16 pills because "that's an even number we can split." CAMP and CI-1 discussed how much it would cost to purchase the drugs and CAMP told CI-1 that CAMP would give CI-1 the money to pay for the drugs.

4

10.     According to Western Union records, an individual identified as "Jack Camp" wired $290.00, to CI-1, which CI-1 picked up on September 29, 2010.

11.     On or about October 1, 2010, at approximately 3:00 p.m., in a recorded telephone conversation, the defendant, JACK T. CAMP, JR., and CI-1 discussed the fact that CI-1 had a felony conviction and it was that conviction that was preventing a potential employer from hiring CI-1. CAMP and CI-1 discussed the fact that CAMP had previously said he would try to help CI-1 with CI-1's criminal record. At one point, CAMP told CI-1 that CI-1 should tell the potential employer that "it was a minor offense and that one of the judges on the court can explain that to him. And that it doesn't indicate that you were really dealing drugs, you just made some phone calls."

12.     In the same conversation, the defendant, JACK T. CAMP, JR., and CI-1 discussed the possibility of a friend of CI-1's spending time with CAMP and CI-1. CAMP indicated that he needed to be careful about using illegal drugs in front of someone he did not know stating that his "situation [was] more precarious." Specifically, CAMP stated that he would like to meet and get to know CI-1's friend and "make sure that I feel I can trust her before we go the whole monty with it." When asked what he meant by the "whole monty," CAMP said that he meant using "drugs."

13.     On or about October 1, 2010, at approximately 5:45 p.m., in another recorded telephone conversation, the defendant, JACK T. CAMP, JR., and CI-1 again discussed drugs that they had planned to use when they met over the weekend. CI-1 told CAMP that CI-1 had tried to get the drugs with the money CAMP sent but had been unsuccessful. Specifically, CI-1 told CAMP that CI-1 had given the money to another individual who was supposed to give CI-1 the

5

Roxycodone, but that individual, though taking the money, had not provided the pills. CI-1 then indicated that CI-1 had found a different person from whom they could purchase drugs that evening for their weekend plans. CI-1 told CAMP that CI-1 was concerned for CI-1's safety and asked if CAMP was willing to "follow" CI-1 like he had previously. CAMP responded, "I'll watch your back anytime 'cause I'm afraid and I not only have my little pistol, I've got my big pistol so, uh, we'll take care of any problems that come up."

14.  In the same conversation, the defendant, JACK T. CAMP, JR., returned to the earlier conversation by saying that he thought it "might have been fun" to have CI-1's friend spend time with them. CAMP further stated "I just might not have used drugs unless I really trusted her you see."

15.  On or about October 1, 2010, at approximately 7:15 p.m., in a recorded meeting, the defendant, JACK T. CAMP, JR., and CI-1 met in the parking lot of Publix, located at 2562 Shallowford Road, NE, Atlanta, Georgia. CAMP and CI-1 discussed the details of purchasing the drugs they intended to use over the weekend. CAMP stated that he needed to go to an ATM to get money for, among other things, the drugs they were on their way to buy. CAMP stated that he wanted to meet the individual from whom they were going to buy the drugs. CI-1 asked CAMP if he had brought "protection" because CI-1 did not know the drug dealer very well. CAMP indicated to CI-1 that he had a gun on his person telling CI-1 "yes, feel right there," and CI-1 actually felt the hard metal of the gun in CAMP'S front pants pocket. In discussing the drug transaction, CAMP told CI-1, "let me let you pay him because you've already got a record, I don't."

16. Video recordings obtained from an ATM at the above-described Publix depict that on or about October 1, 2010, at approximately 7:20 p.m., the defendant JACK T. CAMP, JR., approached the ATM. The recording includes transaction details which indicate that CAMP withdrew $400.00. CAMP then gave CI-1 $160.00 in cash to pay for the drugs.

17. On or about October 1, 2010, at approximately 7:25 p.m., the defendant, JACK T. CAMP, JR., and CI-1 each drove in their respective cars to the parking lot of the Velvet Room, located at 3358 Chamblee Tucker Road, Atlanta, Georgia.

18. On or about October 1, 2010, at approximately 7:35 p.m., in a recorded meeting, the defendant, JACK T. CAMP, JR., and CI-1 met with an undercover law enforcement agent ("UC") for the purpose of buying Roxycodone and cocaine. CI-1 gave the UC $160.00 in cash in exchange for a clear plastic bag containing blue colored pills and a baggie containing a white, powdered substance which were represented to be Roxycodone and cocaine respectively. The UC told CAMP that he had given CAMP and CI-1 more pills than what they had paid for and told CAMP that he would be well taken care of in any future drug purchases. CAMP responded, "We'll call you again." CI-1 then gave CAMP the pills and white powdered substance to hold because, CI-1 stated, CI-1 didn't have any pockets. CAMP took the pills and white powdered substance and put them in his pocket.

19. On or about October 1, 2010, at approximately 7:45 p.m., FBI agents arrested the defendant, JACK T. CAMP, JR. FBI agents recovered the plastic bag containing blue pills and the baggie containing a white powdered substance. CAMP was asked if he had any weapons on his person, and CAMP initially indicated that he did and then said that he did not. Two firearms were recovered from the front seat of CAMP'S vehicle: a .380 Sig Sauer P238, serial number

7

DA003418, and a Colt MK IV Series 80, serial number 24504E. The .380 Sig Sauer had a loaded magazine, and a round seated in the chamber and the hammer of the gun was cocked. The Colt MK IV had a loaded magazine but no round in the chamber.

20. On October 2, 2010, Special Agent Jon T. Judkins, of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who has received specialized training in making firearms nexus determinations, conducted research regarding the above described .380 Sig Sauer and Colt MK IV to determine their places of origin. SA Judkins determined that both of these firearms, the .380 Sig Sauer and the Colt MK IV, were manufactured outside the state of Georgia.

## CONCLUSION

21. Based on the foregoing information, I respectfully submit that there is probable cause to believe that the defendant, JACK T. CAMP, JR., has violated Title 21, United States Code, Sections 844(a), 846, and Title 18, United States Code, Sections 922(g)(3) and 2, in that he has (1) possessed cocaine, a Schedule II controlled substance, Roxycodone, a Schedule II controlled substance and marihuana, a Schedule I controlled substance; (2) aided and abetted CI-1's possession of cocaine, a Schedule II controlled substance, Roxycodone, a Schedule II controlled substance and marihuana, a Schedule I controlled substance, knowing that CI-1 is a convicted drug felon; (3) attempted to possess cocaine, a Schedule II controlled substance and Roxycodone, a Schedule II controlled substance; (4) attempted to aid and abet CI-1's possession cocaine, a Schedule II controlled substance and Roxycodone, a Schedule II controlled substance, knowing that CI-1 is a convicted drug felon; and (5) being an unlawful user of controlled substances possessed firearms.